**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| Thomas H. Hodgson, in his capacity as | ) | C.A. No. 12081-MA |
| Attorney-In-Fact for Paul M. Hodgson, Jr., | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| Elsie E. Gibson, | ) | |
| Respondent. | ) | |

**MASTER'S REPORT**

Date Submitted:  December 30, 2016
Draft Report:
Final Report:  February 24, 2017

An adult son, in his capacity as agent of his incapacitated father, filed a petition seeking a judgment from the Court declaring that the Delaware Durable Powers of Attorney Act authorizes him to sell his father's solely-owned residence.[1]  The agent's petition is opposed by his father's third (and current) wife who lives in the residence and stands to inherit the property if she survives her husband.  The wife counterclaimed for breach of fiduciary duty, alleging that the agent has a conflict of interest because by selling the property, he would divert to himself a substantial expectancy under his father's will.  In her counterclaim, the wife seeks (a) an order limiting the power of attorney with a requirement of judicial approval before any action is taken affecting the principal's residence or (b) an order appointing her as co-guardian of her husband's property.  The agent has filed a motion for summary

judgment, which is opposed by the wife who argues that there is a genuine issue of material fact whether the agent is in breach of his fiduciary duty to his principal. For the reasons that follow, I recommend that the Court grant summary judgment in favor of the agent.

## Factual Background[2]

On November 21, 2009, Paul M. Hodgson, Jr. and Elsie E. Gibson were married. The couple were in their 70s and it was a third marriage for both. Because each had significant personal assets, the couple executed a Pre-Nuptial Agreement on July 25, 2009, to protect their respective assets in the event of divorce or death.[3] The agreement was drafted by a Delaware attorney and the parties executed the agreement in Delaware.[4] At the time, both Mr. Hodgson and Mrs. Gibson owned their own residences and, following their marriage, they lived together in Mrs. Gibson's house located at 15 Bridlebrook Lane in Newark. In April 2012, however, they moved into

---

[1] *See Del. C.* Ch. 49A.

[2] This factual background is taken from the undisputed pleadings except where otherwise noted.

[3] Verified Petition for Declaratory Judgment, Ex. A. The schedules attached to the prenuptial agreement reveal that in 2009, Mrs. Gibson had assets worth nearly $1.6 million, including a residence and a separate rental house while Mr. Hodgson had assets worth $1.4 million, including a residence and 1/3rd interest in a Rehoboth Beach cottage. Docket Item ("DI") 2.

[4] *Id.*

Mr. Hodgson's house located at 208 Hullihen Drive in Newark, Delaware (hereinafter "the 208 Hullihen Property").[5]

On February 7, 2013, Mr. Hodgson executed the following estate planning documents in which he named his son and daughter in various fiduciary capacities.[6] Mr. Hodgson executed a revocable trust agreement (hereinafter "the Trust") as settlor and trustee, which provided for Mr. Hodgson to receive any net income or principal from the Trust during his lifetime and, after his death, for the Trust to be distributed in equal shares to his son and daughter, *per stirpes*.[7] In his last will and testament (hereinafter "the Will"), Mr. Hodgson left his tangible personal property to his son and daughter, the 208 Hullihen Property to Mrs. Gibson, and his residuary estate to his Trust.[8] Mr. Hodgson named his son Thomas as successor trustee of his Trust, as executor of his Will, and as his agent under a Delaware Durable Power of Attorney (hereinafter "Power of Attorney") that Mr. Hodgson also executed on February 7th.[9] On the same day, Mr. Hodgson executed an advance directive for health care, naming his son and daughter as co-agents empowered to make medical and personal care

---

[5] Petitioner's Opening Brief in Support of His Motion for Summary Judgment, Ex. M (Deposition of Elsie E. Gibson at 10-11). DI 29.

[6] Petitioner Thomas H. Hodgson and his sister Paula H. Beland are Mr. Hodgson's children from a previous marriage. Mrs. Gibson has two adult children and a stepdaughter from her previous marriages. *Id.*, Ex. M (Deposition of Elsie E. Gibson at 15, 38).

[7] *Id.* Ex. D.

[8] *Id.* Ex. B.

[9] *Id.* Exs. B & C.

decisions for him during any period of his incapacity and, if a guardian was necessary, expressing a preference that his son Thomas be appointed as his guardian.[10]

In February 2014, Mr. Hodgson suffered an intracranial bleed that caused significant brain injury and left him incapacitated. After several months of treatment at other facilities, Mr. Hodgson was admitted into an assisted living care facility in Middletown, Delaware, where he still resides. In 2015, Thomas, in his capacity as Mr. Hodgson's agent, communicated with Mrs. Gibson about his intent to sell the 208 Hullihen Property and suggested selling the property to Mrs. Gibson at a discounted price.[11] The parties could not agree on a price, however.[12] In early November 2015, Thomas informed Mrs. Gibson of his intent to contact a realtor and list the 208 Hullihen Property for sale.[13] On March 4, 2016, Mrs. Gibson attempted to file in this Court an emergency petition for the appointment of a guardian of the property of Mr.

---

[10] Respondent's Answer and Counterclaim, Ex. A. DI 8. I use first names here in order to avoid repetition and confusion, and intend no disrespect.

[11] Petitioner's Opening Brief in Support of His Motion for Summary Judgment, Ex. M. DI 29.

[12] In June 2009, Mr. Hodgson estimated the value of the 208 Hullihen Property less the home equity loan to be $225,000. *Id.*, Ex. A, Schedule B. On August 26, 2015, Thomas sent Mrs. Gibson an email in which he suggested that after the property's fair market value was determined, the property could be transferred to her for 90 percent of its fair market value. *Id.*, Ex. J. In January 2016, Mrs. Gibson offered to buy the 208 Hullihen Property for $150,000. Respondent's Answer and Counterclaim, Ex. B. DI 8. As of October 2016, the balance of the home equity loan secured by the 208 Hullihen Property was $99,000. Appendix to Respondent's Answering Brief at B-22. DI 37.

Hodgson, seeking to be appointed as co-guardian of her husband's property with Thomas.[14] The emergency petition was rejected by this Court because Mrs. Gibson had failed to file the required physician's affidavit.[15]

## Procedural Background

On March 7, 2016, Thomas filed a Verified Petition for Declaratory Judgment, seeking a declaratory judgment in his favor that the Power of Attorney executed by Mr. Hodgson on February 7, 2013, and the Delaware Durable Personal Powers of Attorney Act give Thomas, as Mr. Hodgson's agent, the power to sell the 208 Hullihen Property.[16] In addition, Thomas seeks his reasonable attorney's fees and court costs. On April 6, 2016, Mrs. Gibson filed her answer and counterclaim.[17] Thomas filed an answer and affirmative defenses to the counterclaim on April 28, 2016.[18] Following discovery, Thomas filed his pending motion for summary judgment on November 22, 2016.[19]

---

[13] Petitioner's Opening Brief in Support of Motion for Summary Judgment, Ex. K.
[14] Respondent's Answer and Counterclaim, Counterclaim Ex. A. DI 8.
[15] *Id.*
[16] DI 1.
[17] DI 8.
[18] DI 10.
[19] DI 29.

Analysis

A party is entitled to summary judgment when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law.[20] The burden is on the moving party to establish that there are no issues of material fact,[21] and the court must review all evidence in the light most favorable to the non-moving party. Once the moving party has met its burden to show no material facts exist, the non-moving party must submit "specific facts showing that there is a genuine issue for trial to survive a motion for summary judgment."[22]

Thomas argues that there are no material facts in dispute and it is appropriate for the Court to grant summary judgment to avoid the unnecessary time and expense of trial. The 208 Hullihen Property is not marital property in which Mrs. Gibson has any ownership interest. The language of the Power of Attorney is clear and unambiguous, and there is no question that Mr. Hodgson was competent at the time he executed the Power of Attorney and the Will. According to Thomas, Mrs. Gibson's desire not to move from the 208 Hullihen Property is simply not relevant to the issue before the Court.

Mrs. Gibson concedes that Thomas has the authority as attorney-in-fact for Mr. Hodgson to sell his father's real estate. However, she argues that, looking at the

---

[20] Ct. Ch. R. 56.
[21] *Scureman v. Judge*, 626 A.2d 5, 10 (Del. Ch. 1992).

evidence in the light most favorable to herself as the non-moving party, there exists a material fact in dispute whether Thomas is breaching his fiduciary duty by selling the 208 Hullihen Property. According to Mrs. Gibson, the proposed sale would be contrary to (a) Mr. Hodgson's testamentary plan because this property has been left to Mrs. Gibson in Mr. Hodgson's Will, and (b) Mr. Hodgson's reasonable expectation that Mrs. Gibson would not be forced to move from her residence. Mrs. Gibson further argues that Thomas's decision to sell the 208 Hullihen Property is not in Mr. Hodgson's best interest because Mr. Hodgson has sufficient funds in his investment accounts to cover his health care expenses for the next 13 years and a sale of this property would prevent Mr. Hodgson from returning home to be cared for by his wife. Finally, Mrs. Gibson argues that Thomas's reasons for the proposed sale are mere pretext and that his own conflict of interest impairs him from acting impartially in Mr. Hodgson's best interest. According to Mrs. Gibson, Thomas could sell Mr. Hodgson's interest in a Rehoboth Beach cottage,[23] but Thomas and his sister currently use this cottage for their own enjoyment. By selling the 208 Hullihen Property, however, Thomas would not only disinherit Mrs. Gibson but also Thomas would increase his own and his sister's inheritances since every dollar spent on Mr.

---

[22] *Id.* at 10-11.

[23] The Rehoboth Beach cottage is owned by a limited partnership that originally consisted of three general partners and three limited partners, namely, Mr. Hodgson and his two sisters. Appendix to Respondent's Answering Brief, at B-104-117. DI

Hodgson's care out of Mr. Hodgson's other assets reduces the inheritances Mr. Hodgson's children expect to receive.

The undisputed record shows that three years after his marriage to Mrs. Gibson, Mr. Hodgson executed several legal documents to ensure that control over his person and his property -- both during his lifetime and after his death -- was placed squarely in the hands of his son and/or daughter, to the exclusion of Mrs. Gibson. Mr. Hodgson's testamentary plan and his reasonable expectations can be discerned in the estate planning documents he executed on February 7, 2013. First, Mr. Hodgson's testamentary plan was for his children (or their issue, *per stirpes*) to inherit his assets, either directly through his Will or indirectly through his Trust, with the possible exception of the 208 Hullihen Property, which was devised to Mrs. Gibson under the provisions of Mr. Hodgson's Will.[24] In light of their earlier Pre-Nuptial Agreement, however, Mr. Hodgson made the following statement in Article 9(C) of his Will:

---

37. Mr. Hodgson's 1/3[rd] limited partnership interest was transferred to his Trust on February 7, 2013. *Id.* at B-118.

[24] As stated in Article 3 of Mr. Hodgson's Will:

> I give all right, title and interests that I may own at the time of my death in my personal residence located at 208 Hullihen Drive, Newark, Delaware, to my wife, Elsie E. Gibson, if she survives me by thirty (3) days, free and clear of any mortgages, liens or encumbrances thereon. If I do not own the property named herein at the time of my death, this devise shall lapse.

Petitioner's Opening Brief in Support of Motion for Summary Judgment, Ex. B.

My wife is Elsie E. Gibson.  I acknowledge that Elsie and I entered into a Pre-Nuptial Agreement on July 25, 2009, in which we specified the various rights and claims each of us would have in the estate and property of the other during the term of the marriage and after death or dissolution of the marriage. It is my intention that the terms of this Will shall supersede any conflicting provisions in such Pre-Nuptial Agreement; provided, however, that nothing herein shall constitute a waiver of my right to revoke and modify the terms of this Will at any time to conform in whole or in part to the provisions in such Pre-Nuptial Agreement.[25]

Thus, although Mr. Hodgson provided for Mrs. Gibson in his Will, Mr. Hodgson explicitly reserved to himself the right to revoke or modify his Will to conform to the Pre-Nuptial Agreement.  In other words, Mr. Hodgson explicitly reserved the right to cut Mrs. Gibson out of his Will.  Mr. Hodgson's subsequent stroke left him incapable of modifying his Will, however, Mr. Hodgson had anticipated such a possibility, as will be discussed below.

Second, Mr. Hodgson's testamentary plan regarding the 208 Hullihen Property, in particular, is subject to two contingencies.  The first contingency is undisputed. The specific devise is contingent on Mrs. Gibson surviving Mr. Hodgson by 30 days. The second contingency -  the specific devise is contingent on Mr. Hodgson still owning the 208 Hullihen Property at the time of his death – is, according to Mrs. Gibson, merely an expression of what is implicit in every provision of a will or, in other words, mere surplusage.  However, it is a basic rule of construction that a court will prefer an interpretation that gives effect to each term of an agreement and avoids

[25] *Id.*

rendering language superfluous or uselessly repetitive.[26]    When the second contingency is read in conjunction with the rest of Mr. Hodgson's Will, in particular, with Article 9(C) of the Will, its meaning is clear:  Mr. Hodgson's testamentary plan regarding the 208 Hullihen Property could be altered at any time prior to Mr. Hodgson's death.

Third, it is evident from his estate planning documents that Mr. Hodgson's testamentary plan and his reasonable expectations regarding the 208 Hullihen Property are one and the same.  On the day he executed his Will, Mr. Hodgson also executed a Power of Attorney naming Thomas as his agent and authorizing Thomas to exercise numerous powers for Mr. Hodgson's benefit in a fiduciary capacity, among them the power:

> [t]o buy, sell, exchange, mortgage, encumber, lease or acquire or dispose of real property, ***including my personal residence located at 208 Hullihen Drive, Newark, Delaware***; to execute and deliver any deed with or without covenants or warranties; to partition and subdivide real property; to manage real property, to repair, alter, renovate, improve, remodel, erect, or tear down any building or other structure or part thereof; and to file documents as may be requested or required by any government or other authority.[27]

---

[26] *Peierls Family Inter Vivos Trusts*, 77 A.3d 249, 265 (Del. 2013) (citing *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001)).

[27] Petitioner's Opening Brief in Support of His Motion for Summary Judgment, Ex. C (emphasis added).  DI 29.

The fact that the Power of Attorney expressly authorizes Mr. Hodgson's agent to sell the 208 Hullihen Property demonstrates that the specific devise of the 208 Hullihen Property to Mrs. Gibson was intended to be part of Mr. Hodgson's testamentary plan only as long as there was some benefit for Mr. Hodgson to retain the 208 Hullihen Property. If, for any reason, it was no longer beneficial for Mr. Hodgson to retain his solely-owned residence, then Mr. Hodgson's reasonable expectation was that his agent would sell the 208 Hullihen Property regardless of the specific devise in his Will.

Mr. Hodgson's estate planning documents demonstrate that he trusted his son and daughter, but not Mrs. Gibson, to act in his best interests in the event he became incapacitated. These documents also demonstrate that Thomas's intended sale of the 208 Hullihen Property is entirely consistent with Mr. Hodgson's testamentary plan.[28]

Thomas's intended sale of the 208 Hullihen Property is consistent with Mr. Hodgson's reasonable expectations because Mr. Hodgson had anticipated that he or his agent might sell this property prior to his death. Although Mrs. Gibson claims that her husband would be very upset if he knew she was being forced to move, the only evidence on this issue is to the contrary. Mr. Hodgson never intended Mrs.

_____

[28] Even if the intended sale were inconsistent with his father's testamentary plan, Thomas would not be liable to Mrs. Gibson under 12 *Del. C.* § 49A-114(c) which states: "An agent that acts in good faith is not liable to any beneficiary of the

Gibson to reside in the 208 Hullihen Property on a permanent basis if he was alive and residing elsewhere.[29] Her claim is based on a remark made by Thomas which Mrs. Gibson has taken out of context. On August 26, 2015, a year and a half after Mr. Hodgson's stroke, Mrs. Gibson offered to pay for the telephone and utilities at the 208 Hullihen Property, which were being paid by Thomas, as agent for Mr. Hodgson. Thomas responded as follows:

> Thanks for reaching out with this idea. For Paula and Tim, who might not have known how you and my father shared costs when living in either of the houses, it is good information to know. I am pretty sure my father never mentioned it to me but of course you shared it with me, probably about the time we were dealing with the 2013 taxes. My point to you in the first few months following the stroke in continuing to pay all of these [house-related] expenses was that until we had a solid understanding of what [Mr. Hodgson's] care needs were going to be and where those might best be met it did not make sense to make any changes. That was a reasonable plan early on when we all hoped [Mr. Hodgson] might overcome some very high odds against him with regard to coming back to the house, and certainly until he left the Lifecare facility in May last year his overall health was a question mark.

> At this point, however, it is not rational for him to retain any ownership of the house or bear any of the cost for it.

principal's testamentary plan for failure to act in a manner consistent with the testamentary plan."

[29] In his Answers to Interrogatories No. 15 & 17, Thomas stated that he asked his father in December 2012 about Mr. Hodgson's intention to modify his will to leave the 208 Hullihen Property to Mrs. Gibson if Mr. Hodgson were to die while the couple was living in the property. Mr. Hodgson informed his son that it was not his intent to pass the property to Mrs. Gibson and eventually to her heirs by way their inheritance from Mrs. Gibson, but rather his intent was that Mrs. Gibson should not have to move if he were to die while they both were still living in the house. Petitioner's Reply Brief in Support of His Motion for Summary Judgment, Ex. B. DI 39.

The former is critical as while he still owns it he still is exposed to liability if someone is injured on the property. A lawsuit, despite having insurance, could quickly deplete his available resources for his long term care. It is the same issue I brought up when I transferred the Passat out of his name.

While the utilities you mentioned below are not insignificant, from a cost perspective the larger drain on his available resources for long term care each month comes from a home equity line of credit on the property, city and county real estate taxes, and homeowner's insurance and an umbrella policy. I am guessing that while living in your house it had no mortgage costs. In addition to the draining of resources due to the ongoing capital costs, if you were to move out of the house at some point or something were to happen to you, the house would no longer be shielded from the state in any way and would be a significant asset available for the state to go after for his care or your care if you depleted your resources.

*It is clear my father did not want you to be forced to move if he were to pass away* and I think I was clear on Saturday that the choice of where you live is for you to make (I hope in conjunction with your family). *I know that he did not intend to put me in the position where I was responsible for the house while you were living in it without him.* I don't believe he envisioned the current situation which is one where he could be (hopefully) with us for quite some time but where his needs require a high cash flow totally apart from the costs associated with your housing.

As I see it the only way we can achieve your objective of not moving as well as my obligation to fulfill my duties as his Agent under the Power of Attorney is for you to buy the house. This would then leave you with the absolute ability to move when and if you chose.

I do know there is a solution that he found acceptable for handling the transfer of a property within a family, as it is set out in the Rehoboth Beach cottage partnership agreement. It involves the two parties each picking an appraiser. These two appraisers then agree on a third and all do appraisals from which the fair market value is determined. The property then is transferred for 90 percent of the fair market value.[30]

---

[30] Petitioner's Opening Brief in Support of His Motion for Summary Judgment, Ex. J (emphasis added). DI 29.

Thus, Thomas tried to accommodate Mrs. Gibson's desire not to move from the 208 Hullihen Property while, at the same time, fulfilling his fiduciary duty to Mr. Hodgson.[31] After the parties were unable to agree on a price to transfer the property to Mrs. Gibson,[32] Thomas decided to sell the 208 Hullihen Property on the open market.

Mr. Hodgson has been a resident of an assisted living care facility now for over two years at a cost of $10,800 per month. The additional cost of more than $2,000 per month to own the 208 Hullihen Property is clearly not in Mr. Hodgson's best interest because Mr. Hodgson derives no benefit from maintaining a residence for Mrs. Gibson, who does not contribute to these expenses.[33] Thomas's intended sale of the 208 Hullihen Property would benefit Mr. Hodgson by providing Mr. Hodgson with additional funds to pay for his considerable healthcare expenses while at the same time eliminating some of his other expenses, including property taxes, utilities,

---

[31] According to an email dated November 3, 2015, Thomas informed Mrs. Gibson that since he had not received any feedback from her, he was planning to engage a real estate agent, and would thereafter allow her the right of first refusal to buy the property before Thomas accepted an offer, but it would be a true "arms length" transaction. *Id.*, Ex. K.

[32] *See* Letter dated January 16, 2016, from Mrs. Gibson's counsel to Thomas's counsel proposing a counteroffer to accept a life estate in the 208 Hullihen Property or, if that was not acceptable, offering to purchase the 208 Hullihen Property for $150,000. Respondent's Answer and Counterclaim, Ex. B. DI 8.

insurance, and payments on a home equity line of credit loan for the 208 Hullihen Property, which provide no benefit for Mr. Hodgson since he no longer resides there.

Furthermore, although Mrs. Gibson argues that there is no medical evidence that Mr. Hodgson is incapable of returning to the 208 Hullihen Property, there is also no medical evidence that Mr. Hodgson is or ever will be capable of leaving the assisted living facility. Mr. Hodgson's children, as co-agents under his advance directive for health care, have the responsibility of determining whether it would be in Mr. Hodgson's best interest to return home. Since Thomas has decided that it is in Mr. Hodgson's best interest to sell the 208 Hullihen Property, Thomas and his sister must have already determined that it is in not in Mr. Hodgson's best interest to return to the 208 Hullihen Property.

The proposed sale of the 208 Hullihen Property is consistent with Mr. Hodgson's testamentary plan and reasonable expectations as reflected in the estate planning documents executed by Mr. Hodgson on February 7, 2013. There is no need for the Court to hear testimony and evaluate the credibility of Thomas or Mrs. Gibson. The proposed sale of the 208 Hullihen Property is designed to provide additional funds for Mr. Hodgson's long term care needs. The mere possibility that

---

[33] Affidavit of Petitioner Thomas H. Hodgson, Petitioner's Opening Brief in Support of His Motion for Summary Judgment, EX. O. DI 29.

the sale also might benefit Thomas (and his sister) after Mr. Hodgson's death does not warrant a finding that Thomas is in breach of his fiduciary duty to his principal.[34]

Since there is no material issue in dispute, Thomas is entitled to summary judgment as a matter of law. The Court should deny the counterclaim as meritless and enter a judgment declaring that Thomas has the authority as agent of Mr. Hodgson to sell the 208 Hullihen Property. Furthermore, the Court should award Thomas his reasonable attorney's fees and costs as damages for having to bring this action to confirm his authority to sell the 208 Hullihen Property as agent under Mr. Hodgson's Power of Attorney.[35] In the interest of moving this case forward, I am waiving a draft report and issuing this recommendation as a Master's Final Report.

---

[34] *See* 12 *Del. C.* § 49A-114(d): An agent that acts with care, competence, and diligence for the best interest of the principal is not liable solely because the agent also benefits from the act or has an individual or conflicting interest in relation to the property or affairs of the principal.

[35] 12 *Del. C.* § 49A-120(c)(2) provides:

   (c) A person that refuses in violation of this section to accept an acknowledged person power of attorney is subject to:

      (1) A court order compelling acceptance of the personal power of attorney; and

      (2) Liability for damages, including reasonable attorney's fees and costs, incurred in any action or proceeding that confirms the validity of the personal power of attorney or authority of the agent to act, or compels acceptance of the personal power of attorney.

The parties are referring to Court of Chancery Rule 144 for the process of taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz