**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| WSFS FINANCIAL CORPORATION and WILMINGTON SAVINGS FUND SOCIETY, FSB, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No.: N18C-09-088 EMD CCLD |
| GREAT AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

Submitted: February 15, 2019
Decided: May 31, 2019

*Upon Defendant Great American Insurance Company's Partial Motion to Dismiss*
***GRANTED in part and DENIED in part***

Adam V. Orlacchio, Esquire, Blank Rome LLP, Wilmington, Delaware, Justin Lavella, Esquire, Dominique A. Meyer, Esquire, Blank Rome LLP, Washington, D.C. *Attorneys for Plaintiffs WSFS Financial Corporation and Wilmington Savings Fund Society, FSB.*

Brian D. Ahern, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware, Michael A. Graziano, Esquire, Eckert Seamans Cherin & Mellott, LLC, Washington, D.C., *Attorneys for Defendant Great American Insurance Company.*

**DAVIS, J.**

## I.      INTRODUCTION

This civil action is assigned to the Complex Commercial Litigation Division of the Court. On September 12, 2018, Plaintiffs WSFS Financial Corporation ("WSFS Corp.") and Wilmington Savings Fund Society, FSB ("WSFS Bank") (collectively, "WSFS") filed a complaint (the "Complaint") against Defendant Great American Insurance Company ("Great American").  WSFS contends that Great American breached the terms of an insurance agreement

(the "Subject Bond")[1] by failing to indemnify WSFS for losses associated with the misconduct by one of WSFS' employees. WSFS asserts three claims for relief: Declaratory Judgment (Count I), Breach of the Subject Bond (Count II); and Bad Faith: Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III).

On November 8, 2018, Great American filed its Defendant's Partial Motion to Dismiss (the "Motion to Dismiss"). Through the Motion to Dismiss, Great American moves to dismiss (i) Counts I and II to the extent those counts are predicated on the categories of loss identified in paragraphs 55 through 59 of the Complaint,[2] and (ii) Count III for failing to state a claim upon which relief can be granted. For the reasons set forth below, the Court will **GRANT in part and DENY in part** the Motion to Dismiss.

## II. RELEVANT FACTS[3]

### A. Factual Background

Great American is an Ohio insurance company with its principal place of business in Ohio. Great American is licensed to transact business in Delaware. As alleged, Great American was, at all times relevant to the Complaint, engaged in the business of writing and selling insurance policies and fidelity bonds to Delaware citizens.

WSFS is a Delaware corporation with its principal place of business in Wilmington, Delaware. On February 16, 2016, WSFS Corp. obtained the Subject Bond from Great American on its own behalf, as well as on behalf of its subsidiaries, including WSFS Bank. The Subject

---

[1] A copy of the Subject Bond is Exhibit A to the Complaint.

[2] Great American concedes that some, but not all, of the fees that WSFS paid its attorneys may be covered. Great American acknowledges that further discovery will be necessary to determine the amount that may be covered. Mot. at 4 n.4.

[3] Unless otherwise indicated, the following are the Relevant Facts as alleged in the Complaint. For purposes of the Motion to Dismiss, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to WSFS. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, C.A. No. 09C-09-136, 2010 WL 5825343, at *3.

Bond provides insurance coverage for losses resulting from WSFS' employees' dishonesty or fraudulent conduct.

WSFS Bank is a wholly-owned subsidiary of WSFS Corp. WSFS Bank is a federally-chartered savings bank with its principal place of business in Wilmington, Delaware.

On April 29, 2013, WSFS Bank hired Mr. Tae Kim as Vice President and Director of Select Markets in WSFS Bank's Commercial Banking Division. Mr. Kim was a Relationship Manager at Citibank N.A. before joining WSFS Bank. At Citibank N.A., Dr. Zahid Aslam became Mr. Kim's customer. According to a Search Warrant Application filed by the Federal Bureau of Investigation on April 13, 2016, Mr. Kim approved false and misleading loan applications from customers such as Dr. Aslam in exchange for financial consideration. Mr. Kim engaged in this fraudulent scheme while working at Citibank and WSFS. On August 7, 2017, Mr. Kim pleaded guilty to Conspiracy to Commit Bank Fraud and Attempt to Commit Bank Fraud in the United States District Court for the District of Delaware.

WSFS submitted a proof of loss to Great American to recover losses from Mr. Kim's fraudulent loans. Great American accepted coverage and paid $1,665,532.14 to WSFS.

Later, WSFS submitted an amended proof of loss to recover six categories of damages: (1) $265,711.06 incurred "in establishing the existence and the amount of its loan losses and in mitigating those losses;" (2) $748,929.82 in employee benefits it paid to Mr. Kim; (3) $292,892.35 in costs WSFS allegedly incurred to fund and carry Mr. Kim's fraudulent loans; (4) $19,950.00 WSFS paid to an accounting firm in connection with preparing its Form 10-K filings for the relevant years; (5) $3,750.75 for legal advice about WSFS's public disclosure obligations related to the fraud; and (6) an unknown amount as compensation for the time that WSFS employees spent addressing the implications and costs of the fraud.

Great American requested additional information in support of WSFS' claim for $265,711.06, but denied the remaining five categories of losses. In response, WSFS filed the Complaint, alleging that Great American breached the Subject Bond and the implied covenant of good faith and fair dealing by not indemnifying WSFS for all of WSFS' alleged losses.

Rider 18 to the Subject Bond requires Great American to reimburse all:

"[L]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others, which acts are committed by the Employee with the intent

(1) to cause the Insured to sustain such loss; or

(2) to obtain financial benefit for the Employee, or another Person or Entity.
…

Notwithstanding the foregoing, it is agreed that with regard to Loans and Trading this Bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and which results in a financial benefit for the Employee. However, where the proceeds of a dishonest or fraudulent act committed by an Employee arising from Loans and/or Trading are actually received by person with whom the Employee was acting in collusion, but said Employee fails to derive a financial benefit therefrom, such a loss will nevertheless be covered hereunder as if the Employee had obtained such benefit provided the Insured establishes that the Employee intended to participate therein.
…

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other Employee benefits shall not constitute improper financial benefit."[4]

Rider 18 modified Insuring Agreement A, which states,

Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(1) to cause the Insured to sustain such loss; and

(2) to obtain an improper financial benefit for the Employee or another person or entity. However, if some or all of the Insured's loss results directly or indirectly from

---

[4] Bond, Compl. Ex. 1.

4

a. Loans, that portion of the loss involving any Loan is not covered unless the Employee also was in collusion with one or more parties to the Loan transactions and has received, in connection therewith, an improper financial benefit with a value of at least $2,500; and

b. trading, that portion of the loss is not covered unless the Employee also has received, in connection therewith, an improper financial benefit.

As used in this Insuring Agreement, an improper financial benefit does not include any employee benefits received in the course of employment, including but not limited to: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

As used in this Insuring Agreement, loss does not include any employee benefits (including but not limited to: salaries commissions, fees, bonuses, promotions, awards, profit sharing or pensions) intentionally paid by the Insured.[5]

Rider 11 to the Subject Bond on "Investigative Claims Expense" states:

The Underwriter [Great American] shall indemnify the Insured for reasonable expenses incurred by the Insured in establishing the existence and the amount of any direct loss covered by the Insuring Agreements of this bond, in excess of the applicable deductible amount, as stated in Item 4 of the Declarations. The reasonableness of such expenses shall be determined by the Underwriter, and shall not include internal corporate expenses of the Insured, such as employee wages.

Section 2(v) of the Subject Bond excludes coverage for consequential losses:

This bond does not cover . . . [i]ndirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages;

## B. Procedural Background

On September 12, 2018, WSFS filed the Complaint against Great American for declaratory judgment, breach of the Subject Bond, and breach of the implied covenant of good faith and fair dealing.

On November 8, 2018, Great American filed the Motion to Dismiss, moving to dismiss Counts I and II for five of the six losses for which WSFS seeks to recover. The Motion to

---

[5] Bond, Compl. Ex. 1.

Dismiss also seeks dismissal of Count III because WSFS has not sufficiently alleged bad faith. WSFS did not move to dismiss WSFS' claim for $265,711.06. Great American also filed Defendants' Brief in Support of its Partial Motion to Dismiss. WSFS filed Plaintiffs' Answering Brief in Opposition to Defendants' Partial Motion to Dismiss (the "Opposition") on November 30, 2018. On December 20, 2018, Great American filed Defendants' Reply Brief in Support of its Partial Motion to Dismiss (the "Reply"). The Court held a hearing on the Motion to Dismiss, the Opposition and the Reply on February 15, 2019. At the conclusion of the hearing, the Court took the matter under advisement.

### III. STANDARD OF REVIEW

Upon a motion to dismiss under Civil Rule 12(b)(6), the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[6] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[7] "Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[8]

---

[6] *See Central Mortg. Co,* 227 A.3d at 536; *Cedars Academy,* 2010 WL 5825343, at *3.
[7] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).
[8] *Hedenberg v. Raber*, No. Civ. A. 04C05035 HDR; 2004 WL 2191164, at *1 (Del. Super. Aug. 20, 2004).

## IV. DISCUSSION

Insurance policies "are construed as a whole, to give effect to the parties' intentions."[9] In other words, the Court is to interpret the insurance policy through a reading of all of the relevant provisions of the contract as a whole, "and not on any single passage in isolation."[10] Moreover, an interpretation that gives effect to all the terms of an insurance policy is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive.[11] The Court is also to interpret an insurance policy in a manner that does not render any provisions "illusory or meaningless."[12]

Where the language of an insurance policy is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[13] Ambiguous insurance policy language is construed in the insured's favor—*i.e.*, under the doctrine of *contra proferentem*, the language of an insurance policy must be construed most strongly against the insurance company that drafted the policy.[14] This is because insurance contracts are contracts of adhesion.[15] An insurance policy is ambiguous when the provisions at issue "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[16] An insurance policy is not ambiguous merely because the parties do not agree on the proper construction.[17]

---

[9] *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007).
[10] *O'Brien v. Progressive Northern Ins.*, 785 A.2d 281, 287 (Del. 2001).
[11] *Id.*
[12] *Id.*
[13] *Faraday Capital Ltd.*, 918 A.2d at 1108.
[14] *O'Brien*, 785 A.2d at 288.
[15] *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 320 A.2d 345, 347 (Del. 1974) (holding that an insurance contract is "an adhesion contract, not a truly consensual agreement.").
[16] *Weiner,* 793 A.2d at 440.
[17] *O'Brien*, 785 A.2d at 288.

Coverage language is interpreted broadly to protect the insured's objectively reasonable expectations.[18] Exclusionary clauses, on the other hand, are "accorded a strict and narrow construction."[19] Even so, courts will give effect to exclusionary language where it is found to be "specific," "clear," "plain," "conspicuous" and "not contrary to public policy."[20] The Court also recognizes that case law exists that permits judicial application of the reasonable expectation doctrine to fulfill an insured's expectations even where those expectations contravene the unambiguous, plain meaning of exclusionary clauses.[21]

### A. The Motion to Dismiss will be Granted as to WSFS's claims for Mr. Kim's Employee Benefits and Costs of Work Performed by WSFS Employees.

The term "actual damages" encompasses both "direct" and "consequential" damages.[22] Direct damages are those inherent in the breach. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.[23] Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act.[24]

Consequential damages, also known as special damages, are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship.[25] Consequential damages are not recoverable unless they are foreseeable and are traceable to the wrongful act and result from it. The distinction between

---

[18] *AT&T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *9 (Del. Super. April 25, 2006), *rev'd in part on other grounds*, *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104 (Del. 2007).

[19] *AT&T Corp.*, 2006 WL 1382268, at *9.

[20] *Id.*

[21] *Id.* at *9, n. 123 (citing and reviewing cases that utilized the "reasonable expectation doctrine").

[22] *See Bonanza Rest. Co. v. Wink,* 2012 WL 1415512, at *3 (Del. Super. Apr. 17, 2012).

[23] See *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552 (Del.Ch.)(observing that direct damages follow immediately from the breach).

[24] *Id.*

[25] Barron's Law Dictionary (1984) by Steven Gifis, page 115 (citing 279 P. 279, 281).

direct and consequential damages is the degree to which the damages are a foreseeable and highly probable consequence of a breach. "Because special damages do not necessarily flow from the injury, they must be sufficiently pleaded and proven" under Rule 9(g).[26]

The Subject Bond does address direct and consequential losses or damages. Section 2(v) of the Subject Bond excludes coverage for consequential losses—"This bond does not cover . . . [i]ndirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages…."[27] In addition, Rider 18 of the Subject Bond provides, that with regard to Loans and Trading, the Subject Bond "covers only loss resulting *directly* from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and which results in a financial benefit for the Employee."[28]

WSFS argues that Great American must indemnify it for its alleged losses because these losses are the proximate cause of Mr. Kim's fraudulent conduct. Great American does not dispute that the losses resulted from Mr. Kim's conduct. Instead, Great American argues that these are consequential losses not covered under Section 2(v) of the Subject Bond or otherwise excluded from coverage.

WSFS argues that the losses (discussed below) are not consequential damages under Section 2(v). First, WSFS argues that the losses are not consequential damages because Section 2(v) gives examples of consequential damages ("fines, penalties, multiple or punitive damages") but does not specifically list any of the losses as consequential damages. Second, WSFS argues that the listed examples are all government or court mandated damages, which suggests that Section 2(v) is a narrow provision which does not include the losses. WSFS relies, in part, on

---

[26] *Id.* (citing 167 A. 310, 312).
[27] Bond, Compl. Ex. 1.
[28] Bond, Compl. Ex. 1., Rider 18 (emphasis added).

9

the statutory interpretation theory *ejusdem generis*, which states that courts should interpret a general term or phrase followed by an illustrative list to only encompass the same kind or class of items as those specifically referenced. Third, WSFS argues that the Court of Chancery explained in *Massachusetts Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*,[29] that the language on consequential damages in Section 2(v) was originally adopted to restrict coverage for potential third- party liabilities. WSFS argues that Section 2(v) should not now be used to exclude coverage for first-party losses. Finally, WSFS notes that Great American drafted the contract, so under the doctrine of *contra proferentem*, the Court should resolve any ambiguities in favor of WSFS.

The Court does not find the definition of "consequential damages" to be ambiguous. The Court will not adopt WSFS' interpretation because it seems to ignore the words "…*loss of any nature including, but not limited to*…" when trying to restrict the forms of consequential damages to government or court mandated damages. Moreover, the Court's interpretation is supported by the overall intent of the Subject Bond as contained in other provisions. The Court is to interpret the Subject Bond through a reading of all of the relevant provisions of the contract as a whole, and not on any single passage in isolation. The Subject Bond provides for the purchase of "Optional Insuring Agreements and Coverages." Optional Insuring Agreements and Coverages specifically provide coverage for certain types of consequential damages like "Audit Expense," and "Investigative Claims Expense."[30] The parties, therefore, negotiated for indemnification for certain types of consequential damages like investigative costs and audit fees which would not be necessary if consequential damage exclusion were limited to government or court mandated damages.

---

[29] 2010 WL 2929552, at \*15 (Del. Ch. July 23, 2010).
[30] Bond, Compl. Ex. 1., Riders 11 and Rider 16.

Accordingly, unless consequential damages arising out of Mr. Kim's conduct are otherwise covered under the Subject Bond, *e.g.*, a covered investigative cost, then the Subject Bond does not provide indemnification of those consequential damages.

### 1. *Employee Benefits Paid to Mr. Kim*

WSFS asserts that it is entitled to coverage for the $748,929.82 in salary, benefits, and other compensation that WSFS Bank paid to Mr. Kim.

The case involving Mr. Kim arose out of the approval of false and misleading loan applications. As such, the situation involve "Fidelity" losses and is governed by Rider 18. Rider 18 provides that the Subject Bond covers only losses resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and which results in a financial benefit for the Employee. Rider 18 also states that salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other "Employee benefits" do not constitute improper "financial benefit."

Great American argues that Mr. Kim's compensation is not covered because: (1) the employee benefits did not result "directly" from the fraud scheme; (2) Mr. Kim did not act with the intent to cause WSFS to sustain a loss in the form of employee benefits; and (3) Rider 18 provides that employee benefits are not covered.

WSFS argues that Rider 18 implicitly created coverage for employee benefits. Rider 18 replaced Insuring Agreement A in its entirety, and in doing so deleted the following provision relating to "losses:" "loss does not include any employee benefits . . ." WSFS argues that the deletion of this provision implies that the parties intended for employee benefits to be covered as losses. In addition, WSFS argues that it would not have been necessary for Insuring Agreement

11

A to state that the term "loss" does not include employee benefits if such benefits would be excluded as consequential losses anyway.

In response, Great American cites *BancInsure, Inc. v. F.D.I.C.*,[31] in which the Tenth Circuit found that "removing an exclusion is not the same thing as affirmatively providing coverage [and] does not suggest that all claims of such nature are covered notwithstanding other applicable exclusions." Second, Great American relies on a case which provides that "'if an endorsement extinguishes a policy provision or declares it void and of no effect, such provision cannot be considered in construing the policy.'"[32] So, Great American concludes that the deleted provision cannot be used to alter otherwise unambiguous provisions. Finally, Great American argues that the language in Rider 18 is not superfluous.

Here, the language in the Subject Bond is not ambiguous. So, the Court does not need to consider the possible inferences of deleted portions of the Subject Bond or possibly superfluous language. WSFS is seeking reimbursement of Mr. Kim's employee benefits. Rider 18 provides that the Subject Bond covers only losses that "directly" result from the dishonest or fraudulent acts of Mr. Kim which Mr. Kim intended to cause loss to WSFS *and* which results in a "financial benefit" for Mr. Kim. The loss of employee benefits does not flow naturally from an employee committing fraud and, therefore, constitute consequential damages—a type of loss not covered by the Subject Bond. This is clear because an employee may commit fraud, but still provide some benefit to the company which justifies the employee's salary. The Subject Bond also expressly states that employee benefits, wages and alike do not constitute "improper financial

---

[31] 796 F.3d 1226, 1236 (10th Cir. 2015).
[32] *Ryan*, 686 P.2d at 99 (*quoting* 2 *R. Long, The Law of Liability Insurance* § 16.09 (rev. ed. 1983)); *see also Davis*, 2013 WL 1223696, at *12 ("[T]he Court will not ascertain the parties' intentions from deleted language when the policy language is clear.") (citation omitted).

benefit." For these reasons, the Court finds that Mr. Kim's employee benefits are not indemnifiable under the Subject Bond.

WSFS argues that Mr. Kim acted with intent to deprive WSFS of his salary and benefits because he joined WSFS with the intention of committing bank fraud against WSFS. WSFS cites the fact that Dr. Aslam had been Mr. Kim's customer at Citibank and Mr. Kim and Dr. Aslam continued to work together to commit fraud at WSFS. Mr. Kim's intent as it relates to Employee benefits is not relevant. Losses are defined to be acts "committed by the Employee with the intent to cause the Insured to sustain such loss **and** to obtain financial benefit for the Employee . . ." Rider 18 clearly states that "[s]alaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other Employee benefits *shall not constitute improper financial benefit*." Because the Subject Bond explicitly excludes Employee benefits as an improper financial benefit, Employee benefits are not part of the definition of indemnifiable loss in Rider 18. Accordingly, the Court finds that cause exists to grant the Motion to Dismiss on this claim raised in the Complaint.

### 2. WSFS' Cost to Fund and Carry Fraudulent Loans

Next, WSFS seeks to recover the "costs of equity" it incurred to fund 10% of Mr. Kim's loan amounts because it was required to reserve 10% to be considered well-capitalized under applicable financial regulations. To calculate those costs, WSFS used a theoretical methodology of analyzing the expected return on capital investments known as the Capital Asset Pricing Model. WSFS also seeks to recover the "costs of debt" it incurred in order to fund and carry the remaining 90% of the loan amounts. To calculate those costs, it applied the average interest rates it paid for customer deposits and wholesale borrowings during the relevant time period.

13

Great American argues that costs are not covered because the alleged funding and carrying costs are based on theoretical financial modeling and so are indirect losses. Next, Great American argues that the costs are not covered because the funding and carrying costs arose out of WSFS's contracts and relationships with third parties such as investors, customers, and wholesale lenders and so are consequential damages.

In response, WSFS argues that the costs are not indirect losses just because WSFS used theoretical models to calculate the costs or because the actual amount of the costs may be in dispute. WSFS did not respond to the claim that these costs are not covered because they result from contracts with third parties.

In *Frunzi v. Paoli Servs., Inc.*, the Delaware Superior Court defined consequential damages as "those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship."[33] In *Frank Investments Ranson, LLC v. Ranson Gateway, LLC*, the Court of Chancery found that the determination of whether damages are direct or consequential is fact intensive.[34] The Court of Chancery, in denying a motion to dismiss, found that there was a question of fact as to whether costs associated with the delay of a construction project were direct or consequential damages because a trier-of-fact could reasonably find that the costs were either foreseeable or unforeseeable.

The Motion to Dismiss seeks relief under Civil Rule 12(b)(6). The record, at this point, is very limited. The Court must draw all reasonable inferences in favor of WSFS only dismiss WSFS's claims where WSFS would not be entitled to recover under any reasonably conceivable set of circumstances. The Court finds that it is too soon to dismiss claims for costs to fund and carry fraudulent loans. In this case, if these costs resulted from WSFS' contracts with third

---

[33] 2012 WL 2691164, at *8 (Del. Super. Ct. July 6, 2012).
[34] 2016 WL 769996, at *13 (Del. Ch. Feb. 26, 2016).

parties or are otherwise non-indemnifiable consequential damages, then the costs are not recoverable under the Subject Bond. But, on a more developed record, WSFS may be able to demonstrate that the costs are direct losses from Mr. Kim's fraud. It could be argued that banks regularly incur costs to finance loans, so costs arising from issuing fraudulent loans are a foreseeable and direct result of the underlying fraud. As in *Frank Investments Ranson*, whether the costs were foreseeable is a fact-based inquiry, which the Court should not resolve at the motion to dismiss stage.

### 3. *Fees to Auditors in Connection with WSFS' 10-K filings*

WSFS seeks to recover fees it paid to the accounting firm KPMG.[35] The amended proof of loss describes the services provided by the auditors as follows:

> "Specifically, in connection with the preparation of WSFS' 2016 10-K, KPMG, WSFS' outside auditor, analyzed the circumstances of Mr. Kim's criminal conduct and the impact of that conduct on WSFS' financial statements. Among other tasks, KPMG auditors and specialists inquired of key members of management, reviewed loan files for borrowers related to Mr. Kim's criminal conduct, and performed additional inquiries of external counsel. In connection with the preparation of WSFS' 2017 10-K, KPMG reviewed the appropriate disclosures and technical accounting memorandum to ensure that the fraud loss was accurately presented in WSFS' income statement."

Great American argues that these costs are not covered under Section 2(u) of the Subject Bond, as amended by Rider 16. Great American also contends that these costs are consequential losses because they are based on WSFS' liability to the third-party KPMG. WSFS specifically states that it is not alleging that these costs are covered under Rider 16. Instead, WSFS argues that these costs are the direct result of Mr. Kim's fraud and so are direct losses under Rider 18.

The KPMG claim does not appear to be indemnifiable under Section 2(u). However, the Court is not prepared to find that the KMPG claim seeks recovery for direct damages or

---

[35] Compl. at ¶ 57.

consequential damages. WSFS could provide facts (*e.g.*, KPMG testimony) that demonstrate using KPMG to address Mr. Kim's impact on WSFS's 10-K filings are the necessary and usual result when an employee commits dishonest or fraudulent acts with respect to loans. The Court believes a more developed factual record is appropriate before making a conclusion as to the form of damages.

### 4. *Attorney Fees Related to Public Disclosure Obligations*

WSFS seeks to recover $3,750.75 in attorneys' fees it incurred "in determining its relevant disclosure obligations as a public company in connection with the [fraud scheme]."[36] Great American argues that attorneys' fees are consequential damages and so are not covered under the Subject Bond. Great American cites *Frunzi*[37] for the proposition that attorneys' fees are consequential damages.

As with the KPMG claim, these fees do not appear to indemnifiable under Section 2(u) or Rider No. 11. However, the Court is not prepared to find that the attorneys' fees are direct damages or consequential damages. Like with the KPMG claim, WSFS could develop a factual record that proves that the attorneys' fees are direct damages. The Court believes a more developed factual record is appropriate before making a conclusion as to the form of damages.

### 5. *Costs of Work Performed by WSFS Employees*

Finally, WSFS seeks to recover an "as-yet-uncalculated amount of internal and legal department time expended on addressing the implications and costs of the [fraud] scheme."[38]

---

[36] Compl. at ¶ 58; *see also* Am. Proof of Loss, Ex. 2.
[37] 2012 WL 2691164, at *8 (*quoting Bonanza Rest. Co.*, 2012 WL 1415512, at *3).
[38] Compl. at ¶ 59.

According to the amended proof of loss, WSFS seeks to recover the opportunity cost of time spent by its employees working on the fraud scheme.[39] Great American argues that these are barred by Rider 11 and Section 2(s) of the Subject Bond. Great American also argues that these are barred because they are consequential damages.

Rider 11 to the Subject Bond provides coverage for "reasonable expenses incurred by the Insured in establishing the existence and the amount of any direct loss covered by the Insuring Agreements of this bond."[40] But, Rider 11 limits coverage for investigative expenses by stating that the expenses "shall not include internal corporate expenses of the Insured, such as employee wages." In addition, Section 2(s) of the Subject Bond excludes coverage for "potential income . . . not realized by the Insured."

Here, employee wages for time spent investigating the fraud scheme are clearly barred by Rider 11. These are also clearly consequential damages for which WSFS may not recover because they are an indirect result of Mr. Kim's misconduct. Finally, WSFS may not recover for any potential income it could have generated if its employees were not investigating the fraud under the clear terms of Section 2(s), which excludes coverage for potential income that WSFS could have generated. Therefore, the Court grants the Motion to Dismiss with respect to Counts I and II because these fees are not covered under the Subject Bond.

## B. Great American did not Breach the Implied Covenant of Fair Dealing

The Court will grant the Motion to Dismiss as to Count III because WSFS has not sufficiently pleaded a claim for breach of the implied covenant of good faith and fair dealing.

---

[39] *See* Am. Proof of Loss, Ex. 2 (stating that WSFS seeks to recover for "time" and "the accompanying loss of productivity").
[40] Bond, Ex. 1.

Under Delaware law, the claimant bears the burden of proof for a bad faith claim.[41] The claimant must show that the insurer lacked "reasonable justification" to deny the coverage to the insured.[42] The relevant question is "whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability."[43] "Where the issue to be tried is one of disputed fact, the question of bad faith refusal to pay should not be submitted to the jury unless it appears that the insurer did not have reasonable grounds for relying upon its defense to liability."[44]

WSFS alleges that Great American breached acted in bad faith because it refused to indemnify WSFS for the claims made in the amended proof of loss. In response, Great American alleges that it acted reasonably because five of WSFS' six claims made in the amended proof of loss are barred by law and Great American has requested more information before paying the six claim. The Court is dismissing two of WSFS' six claims. The remaining claims are litigable. The Court's ruling demonstrates that Great American has acted, in part, with reasonable justification. As such, the Court will dismiss Count III for failing to state a claim upon which relief can be granted.

## V. CONCLUSION

For the reasons set forth above, the Motion to Dismiss is **GRANTED** as to Count III and those parts of Counts I and II that relate to (i) Mr. Kim's employee benefits and (ii) costs of work performed by WSFS employees. The Motion to Dismiss is **DENIED** as to those parts of Counts I and II relating to (i) WSFS' cost to fund and carry fraudulent loans, (ii) KPMG's fees in

---

[41] *Bennett v. USAA Cas. Ins. Co.*, 158 A.3d 877, ¶ 13 (Del. 2017).
[42] *Enrique v. State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2016).
[43] *Casson v. Nationwide Ins. Co.,* 455 A.2d 361, 369 (Del. Super. Ct. 1982).
[44] *Id.*

18

connection with (iii) WSFS' 10-K filings and attorneys' fees related to public disclosure obligations.

**IT IS SO ORDERED**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress